601 So.2d 1175 (1992)
NASSAU POWER CORPORATION, Appellant,
v.
Thomas M. BEARD, etc., et al., Appellees.
No. 78275.
Supreme Court of Florida.
May 28, 1992.
*1176 Joseph A. McGlothlin, Vicki Gordon Kaufman, Stephen O. Decker and Matthew D. Soyster of McWhirter, Grandoff & Reeves, P.A., Tallahassee, and Edward Berlin and J. Phillip Jordan of Swidler & Berlin, Chartered, Washington, D.C., for appellant.
Robert D. Vandiver, General Counsel and Marsha E. Rule, Associate General Counsel, Florida Public Service Com'n, Matthew M. Childs, P.A., Charles A. Guyton and C. Alan Lawson of Steel, Hector and Davis, Tallahassee, Florida Power and Light Co., for appellees.
BARKETT, Justice.
This case is before the Court on direct appeal from two final orders of the Florida Public Service Commission (PSC or Commission)[1] relating to the manner in which the PSC determines the "need" for a power plant under the Florida Electrical Power Plant Siting Act (Siting Act).[2] At issue is the relationship, if any, between the requirements of the Siting Act and the requirements of the PSC's regulations[3] governing small power producers and cogenerators.[4]
The Siting Act was passed by the legislature in 1973 for the purpose of minimizing the adverse impact of power plants on the environment. See § 403.502, Fla. Stat. (1989). That Act establishes a site certification process that requires the PSC to determine the need for any proposed power plants, including cogenerators, based on the criteria set forth in section 403.519, Florida Statutes (1989).[5] Section 403.519 requires the PSC to make specific findings for each electric generating facility proposed in Florida, as to (1) electric system reliability and integrity; (2) the need to provide adequate electricity at a reasonable cost; (3) whether the proposed facility is *1177 the most cost-effective alternative available for supplying electricity; and (4) conservation measures reasonably available to mitigate the need for the plant.
Prior to 1990, the PSC did not determine the second and third criteria based on any separate, independent factual basis. Instead, the PSC merely presumed the need for and cost-effectiveness of cogenerators based on the prior approval of the amount of cogenerated power that would have to be purchased by Florida utilities calculated according to the criteria set forth in the cogeneration regulations.[6]See Order No. 22341 (Dec. 26, 1989); Fla. Admin. Code Rule 25-17.083 (repealed 1990).
These cogeneration regulations were promulgated by the PSC in accordance with the mandate of the Public Utilities Regulatory Policies Act (PURPA). 16 U.S.C. §§ 2601-2645 (1988). One of the purposes of PURPA was to foster the development of cogeneration by establishing a mandatory wholesale market for cogenerated electric power. See 16 U.S.C. § 2601(2) (1988); id. § 824a-3.
Under the cogeneration regulations, Florida utilities are required to purchase cogenerated power based on the utilities' "avoided costs"  that is, the costs that the utilities would incur to produce the same amount of electricity if they did not instead purchase the cogenerated power from a qualifying facility.[7]See 18 C.F.R. § 292.101(b)(1) (1991). At all times relevant to this appeal, the avoided costs were calculated on a statewide utility basis, not an individual utility basis. Fla. Admin. Code Rule 25-17.083(4) (repealed 1990). These costs in turn formed the basis for calculating the terms of so-called "standard offer contracts"  contracts to sell electricity that consist of preapproved terms and conditions that the PSC requires utilities, such as Florida Power and Light Company (FPL), to honor with all qualified cogeneration facilities.
Presuming need under the Siting Act by way of the cogeneration regulations, however, presented the awkward possibility that individual utilities would be required to purchase electricity that neither they nor their customers actually needed. See Fla. Admin. Code Rule 25-17.083(5) (repealed 1990). The PSC recognized this problem and in March 1989 held a public hearing to reexamine aspects of its cogeneration policy. The PSC gave notice to every investor-owned electric utility in the state, as well as numerous cogenerators operating as qualified facilities. In the resulting order, No. 22341, the Commission announced that it would no longer automatically presume, based on the cogeneration regulations, that a particular cogeneration facility power plant was needed when making determinations under the Siting Act, but would instead evaluate the need for a cogenerator's capacity based on the individual, localized need of the facility ultimately consuming the cogenerated power. In the Commission's own words, it would no longer use the findings under the cogeneration regulations "as a surrogate for the factual findings required by the Siting Act." Order No. 22341.
On January 1, 1990, one of the parties requested reconsideration of Order No. 22341. On June 15, 1990, before the order became final, appellant, Nassau Power Corporation (Nassau), filed a Petition to Intervene. Nassau, a cogenerator operating as a qualified facility under federal and state law, was seeking permission to build a 435-megawatt gas-fired electric power plant on Amelia Island situated off Florida's northeast coast. On the same date, June 15, 1990, after filing its Petition to Intervene, and thus with full knowledge of the PSC's policy determination in Order No. 22341, Nassau submitted its standard offer contract to sell its anticipated 435 megawatt generating capacity to FPL. The terms of *1178 the standard offer contract were calculated based on the projected statewide need for power in 1996 calculated according to the criteria set forth in the cogeneration regulations.
In Order No. 23792, issued November 27, 1990, the PSC tentatively approved Nassau's contract,[8] but held, consistent with Order No. 22341, that Nassau's standard offer would still have to be evaluated against individual utility need (i.e., the needs of FPL's customers) in separate need determination proceedings under the Siting Act. Nassau appeals this latter portion of Order No. 23792, as well as Order No. 24672 denying its Motion for Reconsideration on this issue.
Nassau argues that the PSC's cogeneration regulations, and its previous policy, prohibit the PSC from determining the need for Nassau's power under the Siting Act based on FPL's individual utility needs, and instead require the PSC to determine need based on the projected statewide electric utility need. The PSC, on the other hand, contends that, notwithstanding its prior practice of not specifically determining actual local needs when evaluating the need for cogenerated power, it is not bound by the cogeneration regulations and is in fact required to assess actual local needs when making need determinations under the Siting Act.
In our view, the PSC's prior practice of presuming need, as opposed to determining actual need, cannot be used now to force the PSC to abrogate its statutory responsibilities under the Siting Act.[9] Moreover, because the policy which Nassau now challenges was already in effect when Nassau signed its standard offer contract, we find the PSC properly rejected Nassau's motion.
On July 23, 1990, when the Commission issued Order No. 23234 reconsidering Order No. 22341, Nassau was a fully participating intervenor in the docket. However, Nassau did not appeal the decision set forth in Order No. 22341 or the subsequent order on reconsideration. Instead, Nassau now appeals two orders that expressly rely on the policy decision which was already in effect pursuant to Order No. 22341 six months prior to the time Nassau signed its standard offer contract with FPL.
It is clear that the PSC order actually being attacked by Nassau's present appeal is Order No. 22341. The later orders are mere restatements. It was by virtue of Order No. 22341 that the Commission first articulated the Siting Act policy and interpretation now challenged by Nassau. Under established principles of appellate review, a party must appeal the order in controversy, not a subsequent order that merely reiterates established precedent. Central Truck Lines v. Boyd, 106 So.2d 547, *1179 548-49 (Fla. 1958); see also Great Southern Trucking Co. v. Carter, 113 So.2d 555, 556-57 (Fla. 1959). Consequently, Nassau should have challenged the PSC's determination by appealing Order No. 23234  the order which affirmed Order No. 22341. Nassau cannot do so now under the guise of appealing the present orders.
As explained by the Commission in Order No. 24672 denying Nassau's Motion for Reconsideration:
Nassau seeks reversal of a policy which was firmly in place by virtue of Order No. 22341 at the time Nassau signed its standard offer contract in June 1990. Prior to signing the standard offer, Nassau had ample opportunity to consider the implications of our previous ruling that a standard offer must be evaluated against individual utility need. In the face of Order No. 22341, Nassau chose to sign its standard offer contract, and Nassau should not now be surprised that we choose to follow our own precedent.
Accordingly, we affirm the orders under review.
It is so ordered.
SHAW, C.J., and OVERTON, McDONALD, GRIMES, KOGAN and HARDING, JJ., concur.
NOTES
[1] We have jurisdiction pursuant to article V, section 3(b)(2) of the Florida Constitution.
[2] § 403.501-.519, Fla. Stat. (1989).
[3] Fla. Admin. Code Rules 25-17.080 to 25-17.091 [hereinafter "cogeneration rules" or "cogeneration regulations"]. These regulations were amended in 1990. The 1990 amendments, however, are not at issue in this appeal.
[4] "Cogeneration" is an efficient and conservational method of producing electricity. See 16 U.S.C. § 796(18)(A) (1988). A cogenerator is an entity which produces electricity through cogeneration.
[5] Section 403.519, Florida Statutes (1989), provides:

On request by a utility or on its own motion, the commission [PSC] shall begin a proceeding to determine the need for an electrical power plant subject to the Florida Electrical Power Plant Siting Act. The commission shall be the sole forum for the determination of this matter, which accordingly shall not be raised in any other forum or in the review of proceedings in such other forum. In making its determination, the commission shall take into account the need for electric system reliability and integrity, the need for adequate electricity at a reasonable cost, and whether the proposed plant is the most cost-effective alternative available. The commission shall also expressly consider the conservation measures taken by or reasonably available to the applicant or its members which might mitigate the need for the proposed plant or other matters within its jurisdiction which it deems relevant. The commission's determination of need for an electrical power plant shall create a presumption of a public need and necessity and shall serve as the commission's report required by s. 403.507(1)(b).
(Emphasis added.) Section 403.519 was originally enacted as part of the Energy Efficiency and Conservation Act, chapter 80-65, section 5, Laws of Florida, but is codified as part of the Siting Act.
[6] Nevertheless, even prior to 1990, the PSC did not presume, based solely on the cogeneration regulations, that the first and fourth criteria (relating to system reliability and conservation measures) had been satisfied.
[7] A "qualifying facility" or "QF" is a small power producer or cogenerator which meets the threshold efficiency standards set forth by the Federal Energy Regulatory Commission pursuant to PURPA. See 18 C.F.R. § 292.201-.211 (1991); Fla. Admin. Code Rule 25-17.080(3).
[8] The primary issue addressed in Order No. 23792 was selecting which cogenerators would fill the 500-megawatt "subscription limit" for the purchase of cogenerated power in 1996. The PSC had previously placed a maximum limit of 500 megawatts on the amount of cogenerated power that Florida utilities would be required to purchase from cogenerators in 1996. At the time of the hearing, nine separate cogenerators had made bids totalling 1765 megawatts for 1996. The PSC determined that the contract bids should be selected based on their date of execution. Accordingly, because Nassau had submitted its standard offer contract first, Nassau was awarded the first 435 megawatts of the 500-megawatt maximum subscription limit. Nassau is not appealing that portion of Order No. 23792.
[9] We reject Nassau's alternative argument that the Siting Act does not require the PSC to determine need on a utility-specific basis. In Order No. 22341, the Commission clearly adopted the position that the four criteria in section 403.519 are "utility and unit specific" and that need for the purposes of the Siting Act is the need of the entity ultimately consuming the power.

We note that under section 403.519, the PSC is designated the "sole forum" for determination of need under the Siting Act. It is well established that the construction placed on a statute by the agency charged with the duty of executing and interpreting it is entitled to great weight. PW Ventures, Inc. v. Nichols, 533 So.2d 281, 283 (Fla. 1988). The PSC's interpretation is consistent with the overall directive of section 403.519 which requires, in particular, that the Commission determine the cost-effectiveness of a proposed power plant. This requirement would be rendered virtually meaningless if the PSC were required to calculate need on a statewide basis without considering which localities would actually need more electricity in the future.